**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **JANE DOE,** *et al.,* ) | |
| ) | |
| *Plaintiffs,* ) | **Case No. 1:25-cv-00760** |
| ) | |
| **v.** ) | **Expedited Hearing Requested** |
| ) | |
| **DOUGLAS A. COLLINS,** ) | |
| **Secretary of Veterans Affairs,** ) | |
| ) | |
| *Defendant.* ) | |
| ) | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER

### INTRODUCTION

On January 29, 2025, the Acting Secretary of Veterans Affairs sent an agency wide-email announcing the Agency's plans to close all diversity, equity, inclusion and accessibility (DEIA) offices in compliance with executive orders and directives from the Office of Personnel Management (OPM). Immediately after the Acting Secretary sent the agency wide email, the Agency closed the VA's Office of Equity Assurance (OEA) and all twenty-seven employees in the office were placed on administrative leave. Plaintiffs, twelve of the twenty-seven employees in the OEA office, filed this complaint, challenging the designation of the OEA as a DEIA office and Plaintiffs as DEIA employees and the subsequent denial of all rights afforded to Agency employees such as access to the Agency's network and email, access to details, transfers and reassignments, and the offer of the Deferred Resignation Program, as violations of their 1st and 5th Amendment rights. Plaintiffs allege that the DEIA designation was erroneous and conducted for

retaliatory purposes. Defendant has blocked Plaintiffs' access to the Agency's network and deprived them of employees benefits and Plaintiffs are unable to receive important correspondence from the Agency such as the Deferred Resignation Program being offered to other Agency employees, and the Agency has in fact advertised their positions on USA Jobs.   Plaintiffs specifically allege violations of their First and Fifth Amendment Rights and the Administrative Procedure Act.

Plaintiffs seek a Temporary Restraining Order enjoining Defendant from designating OEA as a DEIA office and Plaintiffs as DEIA employees and blocking access to the Agency's employee network and employee benefits.  The need for judicial intervention in similar circumstances has been recognized by other federal courts.  On March 31, 2025, in *John Doe 1, et al. v. U.S. Office of Director of National Intelligence, et al.*, Civi Action No. 25-cv-300), the U.S. District Court for the Eastern District of Virginia enjoined Defendants from terminating intelligence officers who worked in DEIA positions, and were placed on DEIA administrative leave following the January 2025 Executive Order.  That court directed the Agencies to consider requests for reassignment to available positions based on qualifications and skills, without regard to the restrictive definition of competitive area in the January 24, 2025 OPM Memorandum- the same memorandum being used to restrict Plaintiffs' employment opportunities in this case.  That court's preliminary injunction represents a significant precedent recognizing that the government's targeted actions against employees based on office assignment rather than actual job duties may constitute unlawful discrimination and warrant judicial intervention. The stigmatizing effect of being designated as "DEIA employees" has created tangible and ongoing harm to Plaintiffs' professional reputations and career prospects.   While on administrative leave, Plaintiffs have been excluded from

professional development opportunities, team meetings, and agency initiatives that would normally contribute to their career advancement.

## **FACTS**

The Plaintiffs are nonpartisan career civil servants selected for positions within Veterans Affairs ("VA" or "Agency"), Veterans Benefits Administration (VBA), Office of Equity Assurance ("OEA") to serve Veterans and provide Veterans equity. Complaint "Compl." at ¶6 and Sworn Declaration of Jane Doe No. 1 "Ex. 2" at ¶2. The Plaintiffs are not advocates for any person or policy other than all Veterans. *Id.* The Plaintiffs' years of service to the federal government range from six to twenty-four years and none of the Plaintiffs have been accused of poor performance or any misconduct. *Id.*

The OEA office was organized in 2023, and filled positions in 2023 and 2024, primarily from employees who were seasoned career professionals with an extensive background in specialty areas that are critical positions with the VBA or the VA over the years; including management and program analysts, IT professionals, administrative staff, claim processors quality assurance specialists, rating Veteran service Representatives, records research specialist, Contract specialists, social workers, and vocational rehabilitation counselors. Compl. at ¶7. Furthermore, none of the employees are probationary. *Id.* The Plaintiffs include disabled Veterans and Veterans, cancer survivors, individuals facing personal hardships, such as loss of family members and impacted by natural disasters, and even a pregnant employee. *Id.*

The job of the OEA was to identify disparities in Veterans receiving their benefits and find ways to ensure equity. Compl. at ¶8 and Ex. 2 at ¶8. For example, OEA did work that could address challenges faced by rural Veterans in accessing their benefits due to geographic barriers and

limited connectivity. *Id.* Many VA communications—such as medical appointment notifications and benefit letters—are delivered in formats that require digital access, which can create obstacles for Veterans living in remote areas or for older Veterans who may be unfamiliar with VA technology. *Id.* To ensure these Veterans receive the benefits they have earned, OEA could identify areas where disparities existed and implement solutions to remove barriers to access. *Id.* This could include evaluating how critical information is delivered and providing alternative options that accommodate Veterans in rural locations. *Id.* Additionally, Plaintiffs work to ensure that Veterans who may struggle with navigating digital systems have clear, accessible pathways to their healthcare and benefits. *Id.* By proactively addressing challenges as such, OEA sought to help ensure that all Veterans could fully utilize the resources available to them and access the benefits that they earned. *Id.* Another example would be addressing disparities in areas with a geographical disadvantage, such as Puerto Rico or Hawaii. *Id.* In addition, the employees performed work such as creating projects to improve access for Veterans such as rural Veterans who resided far away from VA offices; conducted research and analysis to validate or invalidate findings from a recent Government Accountability Office report, GAO-23-106097, that found disparities in the granting of benefits to Veterans based on race; worked to create data sources to easily identify areas where the VA needed to conduct outreach and work with Veteran Service Organizations (VSOs) to bridge gaps in communications with Veterans communities. *Id.* The focus of the OEA office was to ensure equity in delivery of VBA benefits and services to all Veterans.

On January 20, 2025, Donald Trump was inaugurated as the forty-seventh President of the United States and on the evening of January 20, 2025, he signed Executive Order ("EO") 14151, Ending Radical and Wasteful Government DEI Programs and Preferencing. Compl. at ¶9 and Ex. 2 at ¶9. The EO described DEI and DEIA programs as "illegal and immoral." The White House

issued a statement on January 21, 2025, Ending Illegal Discrimination and Restoring Merit-Based Opportunity, which described DEIA programs as "dangerous" and causing "disastrous consequences," "demeaning and immoral," "illegal," and violative of civil rights laws, undermining of "national unity, as they deny, discredit, and undermine the traditional American values . . . in favor of an unlawful, corrosive, and pernicious identity-based spoils system," resulting in "disastrous consequences" on the basis of "pernicious discrimination." *Id.*

EO 14151 ordered all executive agencies to "terminate, to the maximum extent allowed by law," all DEI, DEIA, and 'environmental justice' offices and positions." Compl. at ¶10 and Ex. 2 at ¶10. The January 21, 2025, White House statement required the Executive Branch "to terminate all discriminatory and illegal preferences, mandates, policies, programs, activities, guidance, regulations, enforcement actions, consent orders, and requirements." *Id.*

On January 21, 2025, Charles Ezell, the Acting Director, U.S. Office of Personnel Management (OPM), issued a Memorandum to the Heads and Acting Heads of U.S. Government Departments and Agencies, directing federal agencies to take prompt actions regarding the offices and agency sub-units focusing exclusively on DEIA initiatives and programs, including sending agency-wide notices to employees informing them of the closure and sending notifications to all employees of DEIA offices that they are being placed on paid administrative leave immediately as the agency takes steps to close and end all DEIA initiatives, offices and programs. Compl. at ¶ 10 and Ex. 2 at ¶ 11.

On January 22, 2025, the Acting Secretary of the VA, Todd B. Hunter sent an email to all employees at the VA:

**MESSAGE FROM THE ACTING SECRETARY**

We are taking steps to close all agency diversity, equity, inclusion, and accessibility (DEIA) offices and end all DEIA-related contracts in accordance with President Trump's executive orders titled Ending Radical and Wasteful Government DEI Programs and Preferencing and Initial Rescissions of Harmful Executive Orders and Actions. Compl. at ¶ 11 and Exhibit 1, "Ex. 1," and Ex. 2 at ¶ 12.

These programs divided Americans by race, wasted taxpayer dollars, and resulted in shameful discrimination. *Id.*

We are aware of efforts by some in government to disguise these programs by using coded or imprecise language. *Id.* If you are aware of a change in any contract description or personnel position description since November 5, 2024, to obscure the connection between the contract and DEIA or similar ideologies, please report all facts and circumstances to DEIAtruth@OPM.gov within 10 days. *Id.*

There will be no adverse consequences for timely reporting this information. *Id.* However, failure to report this information within 10 days may result in adverse consequences. *Id.*

In addition to the above, all personnel are directed to withdraw any final or pending documents, directives, orders, materials, and equity plans issued by the agency in response to now-repealed Executive Order 14035, Diversity, Equity, Inclusion and Accessibility (DEIA) in the Federal Workforce (June 25, 2021). *Id.* These actions must be taken immediately, but no later than January 31, 2025. *Id.*

Thank you for your attention to this important matter. *Id.*

Todd B. Hunter

Acting Secretary. *Id.*

On January 22, 2025, OEA employees were invited to an impromptu meeting with the former Executive Director where they were informed that they would be placed on administrative leave. Compl. at ¶12 Ex. 2 at ¶13. All employees were told to provide personal email information so that notices of administrative leave could be sent since they would no longer have access to their government email accounts once they logged off for the day. *Id.* Additionally, employees were instructed to polish their resumes and gather SF-50s to provide to Human Resource personnel

upon receipt of phone call at a later date. *Id.* OEA employees received a January 22, 2025, email from Tracey Therit, Chief Human Capital Officer: *Id.*

"This email provides you with important information regarding your employment status. *Id.* Effective today, January 22, 2025, at 5:00 P.M. EST, you and employees within the Veterans Benefits Administration (VBA), Office of Equity Assurance will be placed on administrative leave with full pay and benefits. *Id.* This administrative leave is not being done for disciplinary purpose." *Id.*

On January 22, 2025, the OEA office was closed/shut down. Compl. at ¶13, Ex. 1, and Ex. 2 at ¶16. On January 24, 2025, OPM issued a memorandum entitled, Guidance Regarding RIF of DEIA Offices (addressed to Heads and Acting Heads of Department and Agencies) which informed agencies to take action to terminate, to the maximum extent of the law, all DEIA offices and positions within sixty days. *Id.* Additionally, agencies were told to begin issuing RIF notices to all employees of DEIA offices immediately. *Id.*

On January 24, 2025, Charles Ezell, Acting Director, U.S. Office of Personnel Management issued a Memorandum to the Heads and Acting Heads of Departments and Agencies concerning Guidance Regarding RIFs of DEIA Offices. Compl. at ¶14 and Ex. 2 at ¶17. In this Memorandum, Mr. Ezell states: "Pursuant to its authority under 5 U.S.C. § 1103(a)(1) and (a)(5), the U.S. Office of Personnel Management ("OPM") is providing the additional guidance to agencies regarding the President's executive order titled, "Ending Radical and Wasteful Government DEI Programs and Preferencing. *Id.* In accordance with that order, each agency, department, or commission head shall take action to terminate, to the maximum extent allowed by law, all DEI, DEIA, and "environmental justice" offices and positions within 60 days. *Id.* OPM's initial guidance required agencies to submit written plans no later than January 31, 2025, for exercising a reduction in force (RIF) action regarding the employees who work in a DEIA office.

*Id.* However, agencies can and should begin issuing RIF notices to employees of DEIA offices now. Agencies are reminded to define the competitive area solely in terms of the DEIA office where the employees worked. *Id.* See 5 C.F.R. § 351.402. *Id.* Please contact DEIAreports@opm.gov if you have any questions regarding this memorandum. *Id.* OPM can provide sample RIF documents upon request." *Id.*

On January 27, 2025, the VA issued a press release. Compl. at ¶15 Ex. 2 at ¶18. The press release provides as follows:

The Department of Veterans Affairs announced today that it has completed its initial implementation of President Trump's executive order to end DEI within the federal government. *Id.*

To date, VA has placed nearly 60 employees who had been solely focused on diversity, equity and inclusion activities on paid administrative leave. *Id.* The combined annual salary (base pay, locality pay and additional earnings) of these employees totals more than $8 million, an average of more than $136,000/year per employee. *Id.* One such employee is making more than $220,000 per year. *Id.*

Additionally, VA has identified several contracts for DEI-related trainings, materials and other consulting services, which the department is currently working to cancel. *Id.* The combined value of these contracts totals more $6.1 million. *Id.*

In the coming weeks and months, VA will be working to reallocate these resources to better support the Veterans, families, caregivers, and survivors the department exists to serve. *Id.*

VA is also in the process of taking down a variety of DEI-related media from its various digital properties. *Id.*

"Under President Trump, VA is laser-focused on providing the best possible care and benefits to Veterans, their families, caregivers, and survivors. *Id.* We are proud to have abandoned the divisive DEI policies of the past and pivot back to VA's core mission. *Id.* We look forward to reallocating the millions of dollars the department was spending on DEI programs and personnel to better serve the men and women who have bravely served our nation," said VA Director of Media Affairs Morgan Ackley. *Id.*

8

On January 28, 2025, a government wide email was sent to federal employees offering a voluntary resignation option with continued pay through September 2025, but Plaintiffs did not receive it since their access had been revoked January 22, 2025. Compl. at ¶16. The email was only sent to active government employees, and it required responses from active government email addresses. *Id.*

While on administrative leave, many of the Plaintiffs reached out to Human Resources point of contacts for specific details on the use of non-disciplinary administrative leave and timeframes, and more importantly, questions regarding the next steps for reassignments within VBA. Compl. at ¶17 Ex. 2 at ¶20. Many were informed by internal leadership personnel within and outside of OEA – to include but not limited to direct communication from VBA Human Chief Officer that included VBA planned to absorb all the OEA staff who were placed on administrative leave and reassign to vacant funded positions at the same or lower grade level. *Id.* Additionally, VBA senior management was advocating for placing the employees in identified positions. *Id.* The Plaintiffs were advised to provide information on their experience and prior positions and positions of interest within the Agency, which they did. *Id.* Senior management at the VBA drafted and presented a plan to OPM to place all the employees within vacant VBA positions at the VA. *Id.* Plaintiffs were informed that VBA was attempting to get them reassigned, and specifically, the Chief of Staff Brandye Terrell and the Acting Undersecretary Michael Frueh, supported reassignment of the Plaintiffs. *Id.* VBA's Chief Human Capital Officer confirmed that there were enough vacancies for reassignment of all 27 employees. *Id.* Many of the Plaintiffs contacted the offices where they worked prior to accepting positions with OEA and were advised that their prior offices would accept them into vacant positions, or contacted other offices for reassignments and were informed they would be accepted into other positions, and were informed that some of the

Plaintiffs would be welcomed if senior management at the VA permitted it. *Id.* Despite these facts, the Office of Personnel Management (OPM) forced the VBA to only allow terminations instead of reassignment of all 27 employees.

On February 5, 2025, OPM issued Memorandum Re: Further Guidance Regarding Ending DEIA Offices, Programs and Initiatives. Compl. at ¶18 and Ex. 2 at ¶21. On February 14, 2025, the Plaintiffs were advised that they were being terminated through a Specific Reduction in Force and that all steps necessary to ensure the integrity and validity of the action was correct and proper. Ex. 5. The Plaintiffs were not offered the option of reassignment. *Id.* The RIF competitive area was limited to the OEA despite the fact that the office had already closed on January 22, 2025. *Id.* The Plaintiffs did not receive due process. *Id.* The Specific Reduction in Force Notice was issued at 6:13 pm EST, after the effective date and time, by Tracey Therit, Chief Human Capital Officer, and provides as follows:

"We regret to inform you that you have been identified for separation by a Reduction in Force (RIF) action. *Id.* We have taken all steps necessary to ensure the integrity and validity of this action. *Id.* You will be separated from Federal service effective at 4:00 p.m. on February 14, 2025. *Id.* We appreciate your dedicated service to this organization. *Id.* Per Executive Order 14151, Ending Radical and Wasteful Government DEI Programs and Preferencing and 5 C.F.R. Section 351.605, we are closing your assigned office and conducting a reduction in force. *Id.* This letter constitutes a specific reduction in force. *Id.* The following is provided for your information and action." Ex. 6.

While this notice was addressed to all Plaintiffs on the said effective date, Plaintiffs received this notice hours, even days after it was sent and made effective. Compl. at ¶19 and Ex. 2 at ¶18. In carrying out the Specific Reduction in Force, the Agency made no attempt to comply with its own and OPM guidelines for implementing a reduction in force. Ex. 6. Those guidelines require a 60-day notice to the impacted employees, and that the Agency create a retention register, and offer reassignment or a severance payment to the employees. *Id.*

At the VA, there have been several reductions in force in VBA such as in the Insurance business line in Philadelphia and the Education Department in St. Louis. Compl. at ¶20 and Ex. 2 at ¶19.  In those RIFs, most of the non-probationary federal employees were given reassignment opportunities to fill Agency vacancies. *Id.*

In issuing the Specific Notice of Reduction in Force to the Plaintiffs, the Agency failed to follow the RIF procedures and failed to complete the Standard Form 8 which allows employees to apply for unemployment benefits. Compl. at ¶ 22 and Ex. 2 at ¶ 24.

On February 26, 2025, OPM issued Memorandum Re: Guidance on Agency RIF and Reorganization Plans Requested by Implementing the President's "Department of Government Efficiency" Workforce Optimization Initiative. Compl. at ¶23 and Ex. 2 at ¶25. On February 27, 2025, the Plaintiffs and all other employees in the OEA were informed that their terminations were being rescinded and they would be placed on administrative leave status from February 14, 2025. Ex. 5 and Ex. 7. Despite placing the Plaintiffs on retroactive paid administrative leave, the Agency failed to pay the Plaintiffs their regular pay which was due February 28, 2025, and only paid Plaintiff for one week for that pay period. *Id.* Plaintiffs have made numerous requests to VA, Tracey Therit, and Aaron Lee to collect wages due to no avail. *Id.* In the same email, the Plaintiffs were issued a notice of a reduction in force because the OEA office was identified as a DEIA office.  Additionally, Plaintiffs remained blocked out of their office emails, and are unable to apply for vacant positions within the VA or apply for details or accept reassignments. *Id.* Defendant's actions have rendered the Plaintiffs unable to continue their careers as federal employees because in applying for any position within the federal government they must disclose that they were placed on administrative leave and terminated because it was determined that their work focused "solely on diversity, equity and inclusion activities;" and they were returned to work and placed on

11

administrative leave with notice that they would be subjected to a reduction in force because they were DEIA employees. *Id.* Their Standard Form 50s will reflect that they worked in the Office Equity Assurance and were terminated. *Id.* Several of the Plaintiffs had job offers pending within the VA and those offers were withdrawn after they were labelled as DEIA employees. *Id.*

On March 13, 2025, Plaintiffs received a Specific Reduction in Force Notice, advising them that they will be separated from federal service on May 10, 2025. Compl. at ¶24 and Ex. 2 at ¶28. The Notice provides that "[P]er Executive Order 14151, Ending Racial and Wasteful Government DEI Programs and Preferencing and 5 C.F.R. 351.605, we are closing your assigned office and conducting a reduction in force." *Id.* The Notice further provides that the Competitive Area is the DEIA office "[P]er OPM Memorandum dated January 24, 2025, competitive area defined as: DEIA office where the employee worked." *Id.* In addition, the Notice states that the Competitive Level is "[A]ll positions within the Office of Equity Assurance." *Id.*

Plaintiffs have been and continue to be irreparably damaged by their sudden placement on administrative leave on January 22, 2025, and removal of access to work computers and the network, termination and reinstatement without access to the Agency's network, and Notice of Specific Reduction in Force. Compl. at ¶27. As noted, the Plaintiffs are non-partisan career employees with government service up to twenty-four years. *Id.* Plaintiffs have a companion office within the VA, the Office of Health Equity, and none of the employees in that office were terminated through a RIF and that office was not designated as a DEIA office and closed. *Id.* All were working on different projects and assignments on January 22, 2025 and were terminated from access to their work and professional colleagues at the VA and other agencies with virtually no notice. *Id.*

**Plaintiff Jane Doe No. 1**

Plaintiff Jane Doe No. 1 is employed as a GS-0343 Management and Program Analyst, 14 step 3 and has 23 years of government service. Ex. 2 at ¶2. Plaintiff Jane Doe No. 1 was assigned to the OEA office in September 2024. *Id.* She described one of her assignments as supporting a VA study, "in concert with the VHA, to validate Pulmonary Function Test (PFT) values amongst populations by comparing differing methodologies to ensure that test results generate by adjusting raw values based on demographic information provided a true and medically sound picture of lung function for the Veteran. Globally, there is a recent consensus that historical models were strongly skewed and not scientifically sound. These results drive decision-making for diagnosis and treatment, to include making baseline requirements for certain procedures or life-saving interventions such as lung transplants. Results thus far showed that a certain group of Veterans were disadvantaged by the current process and less likely to be eligible for lung transplantation surgery. . . . In this role, I was also part of the Toxic Exposure Working Group (TERWG). TERWG was created as a congressional mandate as part of the Sergeant First Class Heath Robinson Honoring Our Promise to Address Comprehensive Toxics Act (PACT Act) PL 117-168 passed in August 2022. The PACT Act is the most significant VA law in decades. TERWG is co-chaired by VA, Department of Defense, and the Agency for Toxic Substances and Disease Registry, and the White House Office of Science and Technology Policy. Other partners and allied parties include the Department of Labor, Center for Disease Control and Prevention (CDC), Department of Commerce, Department of Energy, Health and Human Services (HHS) and Health Outcomes for Military Exposures (HOME). The PACT Act addresses existing and future health consequences for Service members and Veterans exposed to hazardous toxins such as Agent

Orange, radiation and burn pits while serving our country.  TERWG is focused on mitigating or eliminating future toxic exposures and consequences." *Id.* at ¶8.

Jane Doe 1 made efforts to avoid disruption of ongoing interagency work; on January 22, 2025, upon learning she was being placed on administrative leave, she attempted to notify colleagues at DoD and DoL about her immediate unavailability. Ex. 2 at ¶ 14.

Following her removal from the VA network, she sought reassignment and contacted former colleagues in divisions like OTED and MDEO who were open to rehiring her. However, these efforts were blocked by higher-level decisions. Ex. 2 at ¶ 20.

On February 14, 2025, Jane Doe 1 received a Specific RIF Notice after its effective date and time. The notice misstated her performance rating and lacked proper documentation, such as her SF-8. Ex. 2 at ¶¶ 21–22 and Ex. 5.

Jane Doe 1 filed an administrative grievance on February 4, 2025, and amended it on March 7, 2025, citing procedural violations and due process concerns. She received no response. Ex. 2 at ¶26.

As of late February 2025, she remained locked out of VA systems, unable to apply for positions internally, while the VA simultaneously posted her former job title on USAJobs. Ex. 2 at ¶ 36 and Ex. 4.

Jane Doe 1's professional reputation has been severely impacted. She was previously selected for national leadership programs and interfaced with Congress and senior VA leaders. Now, her SF-50 reflects a termination that hiring officials interpret negatively. Ex. 2 at ¶¶ 27, 29, 31.

Jane Doe 1 is a Reasonable Accommodation recipient with a chronic disability. Her health has deteriorated under the stress of her employment status, requiring more medication and rest. Ex. 2 at ¶ 8.

In a past office closures that Jane Doe 1 witnessed while working in management, VBA closed the Winston-Salem Regional Office Certificate of Eligibility (COE) division and all that work was allocated elsewhere. Ex. 2 ¶ 23. Employees from that division were absorbed into positions within the Regional Office to include as Veterans Service Representatives and Public Contact staff. *Id.* This is the normal process to conduct an office closure, and VBA is not doing the same for the OEA staff of which there are many fewer to place and there are many more open positions available. *Id.*

In issuing the Specific Reduction in Force, the Agency failed to follow the RIF procedures and failed to complete the Standard Form 8 which allows employees to apply for unemployment benefits. Ex. 2 ¶ 24. On February 26, 2025, OPM issued a Memorandum Re: Guidance on Agency RIF and Reorganization Plans Requested by Implementing the President's "Department of Government Efficiency" Workforce Optimization Initiative. Ex. 2 ¶ 25. On February 27, 2025, she and all other employees in the OEA who did not already resign were informed that their terminations were being rescinded and they would be placed on administrative leave status from February 14, 2025. Ex. 7.

Separately, Jane Doe 1 received an email to her personal email address on February 27, 2025, at 7:11 a.m. from HRC Baltimore in response to many questions she had posed. Ex. 2 ¶ 26. The HR representative stated that "[a]s this process was conducted outside of VBA, [she has] no knowledge how it was conducted, but that [she is] working to get information to [her]." *Id.*

Additionally, Jane Doe 1 and the other Plaintiffs remained locked out of their office emails, and were unable to apply for vacant positions within the VA or apply for details or accept reassignments. Ex. 2 ¶ 27. Defendant's actions have rendered Jane Doe 1 unable to continue her career as a federal employee because in applying for any position within the federal government she must disclose that she is placed on administrative leave because it was determined that her work focused "solely on diversity, equity and inclusion activities;" and she was returned to work and placed on administrative leave with notice that she would be subjected to a reduction in force because OEA was incorrectly deemed a DEIA office. *Id.* Her Standard Form 50 will reflect that she worked in the Office Equity Assurance and was terminated. *Id.* Several of the Plaintiffs had job offers pending within the VA and those offers were withdrawn after they were labelled as DEIA employees. *Id.*

On March 13, 2025, Jane Doe 1 received a Specific Reduction in Force Notice advising her that she will be separated from federal service on May 10, 2025. Ex. 2 ¶ 28. The Notice provides that "[P]er Executive Order 14151, Ending Racial and Wasteful Government DEI Programs and Preferencing and 5 C.F.R. 351.605, we are closing your assigned office and conducting a reduction in force." *Id.* The Notice further provides that the Competitive Area is the DEIA office "[P]er OPM Memorandum dated January 24, 2025, competitive area defined as: DEIA office where the employee worked." *Id.* In addition, the Notice states that the Competitive Level is "[A]ll positions within the Office of Equity Assurance." *Id.* The memo is dated March 11, 2025 and was signed by Michael J. Frueh on March 12, 2025 but it was emailed to her personal email address on March 13, 2025. *Id.* The memo incorrectly describes her performance evaluation rating for the prior fiscal year, which is an important element in determining retention during a RIF. *Id.* VA calculated the 60-day notice period using March 11, 2025 thereby setting her

termination date as May 10, 2025; however, OPM's Workforce Reshaping Operations Handbook states that "the notice period begins the day after the employee receives the RIF notice. The agency does not count the date the employee receives the notice, or the effective date of the RIF action." *Id.* May 10, 2025 is only 58 days from March 13, 2025 and VA should neither count March 13, 2025 nor the effective date towards the 60-day notice they are entitled to receive according to 5 C.F.R. § 351.801(a)(1). *Id.*

The Specific Reduction In Force notification on March 13, 2025 sent to Jane Doe 1's personal email address includes errors and omits much needed information. Ex. 2 ¶ 29. To date, she does not have confirmation that these errors have been rectified. *Id.* She requested a copy of her personnel record which she has not received as of this time. *Id.*

The Plaintiffs have also been and continue to be irreparably damaged by VA's insistence on limiting their competitive area to the "DEIA office where the employees worked." Ex. 2 ¶ 30. OPM provided this guidance to ALL agencies and told the agencies to review it against 5 C.F.R. § 351.402. *Id.* In OPM's Workforce Reshaping Operations Handbook, which defines competitive areas, it states that "a minimum headquarters or field activity competitive area is any organizational unit under separate administration (which is explained below) within the local commuting area." *Id.* It then defines "separate administration" as: (1) Is the administrative authority to take or direct personnel actions (including the authority to establish positions, abolish positions, assign duties, etc.) rather than the issuance or processing of the documents by which these decisions are effected; *Id.* (2) Means that the organizational unit is separately organized and clearly distinguished from other organizational units within the same local commuting area in regard to operation, work function, staff, and personnel management; *Id.* (3) Recognizes that individual organizational components may be under separate administration even though many agencies reserve final

approval of certain personnel actions to a higher level in the agency (including classification of positions, filling of higher-graded positions, processing of personnel actions, etc.); *Id.* and (4) Is evidenced by the agency's organizational manual and delegations of authority that document where, in the organization, final authority rests to make decisions such as establishing positions, abolishing positions, assigning duties, etc. *Id.*

      This is the standard for a minimum competitive area in a local commuting area, in either a headquarters organization or field component. *Id.* VA took this guidance and established competitive areas for all of its Administrations in VA Handbook 5005/61 on November 20, 2012. *Id.* At Section B when discussing Central Office positions, it states "the Office of Secretary and each office of an Under Secretary, Assistant Secretary, or Other Key Official, constitute separate competitive areas." *Id.* The Office of Equity Assurance was led by an Executive Director, not an Under Secretary, Assistant Secretary nor Key Official and it reported to the VBA Chief of Staff's Office which reported to the Under Secretary for Benefits (USB). *Id.* As such, their competitive area should consist of all offices under the USB which would be large enough for some, if not all, OEA employees to receive reassignment offers. *Id.* Instead, VA chooses to limit their competitive area to the "DEIA office where the employees worked" against its own Handbook and OPM's Handbook so that the only outcome is the Plaintiffs' termination. *Id.*

      Jane Doe 1's professional reputation has been harmed. Ex. 2 ¶ 31. Over a career of 23 years, she was noted to be a dedicated civil servant, working for the good of Veterans, her employees and the organization. *Id.* She was selected numerous times for competitive leadership training programs and graduated from LEAD and LVA (top VBA and VA programs, respectively). *Id.* Her promotion to AVSCM was approved by the then Undersecretary. *Id.* She served on detail at an Area office. *Id.* She mentored in national leadership programs and taught at national

supervisory classes. *Id.* She was selected as a subject matter expert representative at national conferences for the BDD and IDES programs. *Id.* She hosted and led training conferences for the NC congressional delegations. *Id.* She worked directly with NC state leaders on military and Veterans issues. *Id.* She was the appointed point of contact for Veterans Service Organizations in the state of North Carolina for the state VBA Regional Office. *Id.* She served on numerous nationwide workgroups, and presented findings and conclusions to senior SES leaders in headquarters. *Id.* She organized, publicized and hosted many large outreach events with thousands of Veterans, including those coming from across the country for services. *Id.* These successful events were frequently highlighted in the media, and her name was the point of contact as the subject matter expert. *Id.* She built a career on being knowledgeable, dependable and trustworthy. *Id.* Her reputation was well-known to be both Veteran- and employee-centric. *Id.* She innovated many improvements in process and procedures. *Id.* Then she was abruptly put on leave while awaiting separation. *Id.* Her work and association has been described as "wasteful," and that she was engaged in discrimination, was divisive and the work was "shameful" per a message sent January 22, 2025 from the Acting Secretary of VA to all employees. *Id.* These sentiments and more have been echoed publicly by President Trump, the White House Press Secretary, Elon Musk and many others. *Id.*

Plaintiffs have a companion office within the VA, the Office of Health Equity, and none of the employees in that office were terminated through a RIF and that office was not designated as a DEIA office and closed. Ex. 2 ¶ 32. Plaintiffs were working on different projects and assignments on January 22, 2025 and were terminated from access to their work and professional colleagues at the VA and other agencies with virtually no notice. *Id.* They are dedicated civil servants who have worked for the good of all Veterans, and routinely been praised and promoted

for performance. *Id.* Their careers have been destroyed by false accusations that their work was "wasteful" and they engaged in discrimination and their work was "divisive" and "shameful." *Id.* These sentiments have been echoed publicly by President Trump, Elon Musk, and members of Congress. *Id.* Future prospective employers will see the employment applications of them and see long term federal government employees who were abruptly terminated and conclude it was done because of misconduct or performance. *Id.*

Jane Doe 1 submitted an Administrative Grievance on February 4, 2025 in response to being placed on Administrative Leave and the closure of OEA without reassignment. Ex. 2 ¶ 33. She submitted an amended Administrative Grievance on March 7, 2025 to include complaints regarding the planned Reduction In Force and the determination of the competitive area. *Id.* To date, she has not received a signed or itemized reply to either despite it being past the allowed timeframe for responses under the Administrative Procedures Act (APA). *Id.*

The Agency is now advertising vacant positions as Management and Program Analysts on USA Jobs, a position that she previously held, while continuing to deny them access to their work emails nor offering them reassignments. Ex. 2 ¶ 36.

At least some of the Plaintiffs have filed complaints with the Office of Special Counsel, and their complaints have been dismissed and they have been told that they may refile their complaints after their reductions in force become effective.  Ex. 3.


## LEGAL STANDARD AND REVIEWABILITY

Plaintiffs are entitled to a temporary restraining order enjoining the designation of OEA as a DEIA office and Plaintiffs as DEIA employees and blocking Plaintiffs' access to the Agency's

network and depriving them of employees benefits, such as important correspondence from the Agency including the Deferred Resignation Program being offered to other Agency employees. "An application for a TRO is analyzed using the same factors applicable to a request for preliminary injunctive relief." *Harris v. Bessent*, 2025 WL 521027, at *2 (D.D.C. Feb. 18, 2025). To obtain such relief, a plaintiff must show "(1) that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest." *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014) (cleaned up). Where "the movant seeks to enjoin the government, the final two TRO factors … merge." *D.A.M. v. Barr*, 474 F. Supp. 3d 45, 67 (D.D.C. 2020).

The Agency's designation of OEA as a DEIA office and Plaintiffs as DEIA employees and blocking access to the Agency's employee network and employee benefits is immediately reviewable. *See Turner v. U.S. Agency for Glob. Media,* 502 F. Supp. 3d 333 (D.D.C. 2020) In *Turner,* Chief Judge Howell, after analyzing in detail the CSRA and the circumstances under which federal career employees could file complaints in federal court, concluded that there was a narrow exception for career employees who were not challenging actions which must be filed with the MSPB or the Office of Special Counsel, and were not challenging working conditions but actions that infringed upon their constitutional rights. *See Turner v. U.S. Agency for Glob. Media,* 502 F. Supp. 3d at 381 (holding that an employee whose constitutional claim raises issues totally unrelated to the CSRA procedures can file directly in the district court, and granting TRO and preliminary injunction to Voice of America employee asserting First Amendment claim and holding that retaliating based on perceived association violates First Amendment). Violations of

constitutional rights and other offenses are frequently found to fall outside the CSRA's defined "personnel actions" including working conditions. *See e.g. Gustafson v. Adkins*, 803 F.3d 883, 890 (7th Cir. 2015) (finding that supervisor's conduct in installing covert surveillance equipment in female changing area "extend beyond the bounds of personnel action as defined by the CSRA"); *Stewart v. Evans*, 275 F.3d 1126, 1130 (D.C. Cir. 2002) (holding that claims related to a warrantless search of an employee's property are not precluded by the CSRA); *Brock v. United States*, 64 F.3d 1421, 1424 (9th Cir. 1995) (finding that rape and sexual abuse of an employee by a supervisor was not a "working condition").

The designation of OEA as a DEIA office and Plaintiffs as DEIA employees and blocking access to the Agency's employee network and employee benefits began on January 22, 2025, and the Plaintiffs are suffering from its "effects" in a "concrete way." *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807-08 (2003). The issues raised in this motion are thus "fit[] … for judicial decision" now. *Saline Parents v. Garland*, 88 F.4th 298, 306 (D.C. Cir. 2023); *see Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 162 (2014) (permitting review where plaintiff's conduct was "arguably proscribed" by law); *Cooksey v. Futrell*, 721 F.3d 226, 240 (4th Cir. 2013) (First Amendment rights "are particularly apt to be found ripe for immediate protection").

Moreover, "the hardship" to Plaintiffs of "withholding court consideration" until some later date would be immense. *Saline Parents*, 88 F.4th at 306. This case is not "dependent on contingent future events that may not occur as anticipated, or indeed may not occur at all," *Trump v. New York*, 592 U.S. 125, 131 (2020) —the harm is occurring now.

## ARGUMENT

# I. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

## A.    The Agency's designation of OEA as a DEIA Office and Plaintiffs as DEIA employees Violates the First Amendment.

Plaintiffs will likely succeed in demonstrating that the Agency's designation of OEA as a DEIA office and Plaintiffs as DEIA employees and blocking access to the Agency's employee network and employee benefits violates the First Amendment by (1) discriminating against the Plaintiffs on the basis of perceived viewpoint; and (2) retaliating against the Plaintiffs for their erroneously perceived exercise of associational rights.

On January 20, 2025, President Trump signed Executive Order ("EO") 14151, Ending Radical and Wasteful Government DEI Programs and Preferencing. Compl. at ¶9. The EO described DEI and DEIA programs as "illegal and immoral" and the White House later issued a statement on January 21, 2025, Ending Illegal Discrimination and Restoring Merit-Based Opportunity, which described DEIA programs as "dangerous" and causing "disastrous consequences," "demeaning and immoral," "illegal," and violative of civil rights laws, undermining of "national unity, as they deny, discredit, and undermine the traditional American values . . . in favor of an unlawful, corrosive, and pernicious identity-based spoils system," resulting in "disastrous consequences" on the basis of "pernicious discrimination." *Id.* The EO 14151 ordered all executive agencies to "terminate, to the maximum extent allowed by law," all DEI, DEIA, and 'environmental justice' offices and positions." Compl. at ¶ 10.

On January 22, 2025, the Acting Secretary of the VA, Todd B. Hunter sent an email to all employees at the VA advising that the Agency was taking steps to close all DEIA offices because these programs divided Americans by race, wasted taxpayer dollars, and resulted in shameful discrimination. Ex. A.

The January 22, 2025 email of the Acting Secretary openly targeted the OEA office and the Plaintiffs, and claimed that DEIA offices and DEIA employees  divided Americans "by race, wasted taxpayer dollars, and resulted in shameful discrimination." Ex. A. It punishes Plaintiffs for these perceived transgressions by closing the OEA office and later blocking these employees from access to work email and the Deferred Resignation Program and all benefits offered to all other Agency employees.   This is clear retaliation against the Plaintiffs in violation of the First Amendment.

**B.      The January 22, 2025 Email of the Acting Secretary and its Implementation Discriminates and Retaliates in Violation of the First Amendment**

The First Amendment generally prohibits government officials from dismissing or demoting an employee because of the employee's engagement in constitutionally protected activity, even if the government employer's belief about the employee's activity is erroneous. *Elrod v. Burns,* 427 U.S. 347 (1976); *Branti v. Finkel,* 445 U.S. 507 (1980); *Heffernan v. City of Patterson,* 136 S.Ct. 1412, 1417-19 (2016) (demotion based on erroneous belief of employee engaging in political activity violates First Amendment).   The First Amendment "prohibits government officials from subjecting individuals to 'retaliatory actions' after the fact for having engaged in protected speech." *Hous. Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474 (2022) (quoting *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019)); *see also Hughes v. City of New York*, 680 F. App'x 8, 10 (2d Cir. 2017) (retaliating based on "'perceived' association" violates First Amendment); *Turner v. U.S. Agency for Glob. Media*, 502 F. Supp. 3d 333, 381 (D.D.C. 2020) (retaliating "on the basis of perceived viewpoint" violates First Amendment); *see generally Heffernan v. City of Paterson, N.J.*, 578 U.S. 266, 272-73 (2016).

The January 22, 2025 email of the Acting Secretary and its implementation by the Agency retaliates against the Plaintiffs for perceived association with DEIA policies. It announces the closure of DEIA offices and it imposes a severe draconian punishment—placement on administrative leave without any rights to be reassigned elsewhere in the Agency, while being denied all rights afforded to other federal employees, such as access to the Agency's network and email, and access to details, transfers and reassignments, and the offer of deferred resignation, and opportunities to pursue other positions and reassignment.

Plaintiff Jane Doe No. 1 detailed that "[w]hile on administrative leave, many of us reached out to Human Resources point of contacts for specific details on the use of non-disciplinary administrative leave and timeframes, and more importantly, questions regarding the next steps for reassignments within the VBA. We were informed by internal leadership personnel within and outside of OEA that VBA planned to absorb all of the OEA staff who were placed on administrative leave and reassign to vacant funded positions at the same or lower grade level. Additionally, VBA senior management was advocating for placing the employees in identified positions. We were told senior management at the VBA drafted and presented a plan to OPM to place all the employees within vacant VBA positions at the VA. We were informed that VBA was attempting to get them reassigned as there were sufficient open positions. Many of us contacted the offices where we worked prior to accepting positions with OEA and were advised that our prior offices would accept us into vacant positions, or contacted other offices for reassignments and were informed we would be accepted into other positions, and were informed that some of us would be welcomed if senior management at the VA permitted it. Despite these facts, none of us received reassignment offers.  . . . Personally, I called a former coworker now in Outreach, Transition and Economic Development (OTED) and informed him that I would be interested in

reassignment to his division to which he said he was agreeable if allowed.  At a later date, a different former coworker noted to me that she had tried to get me assigned to a position within the Medical Disability Examination Office (MDEO) but "was not allowed."  Ex. 2, Jane Doe Declaration at 21.

Such reprisal clearly violates the First Amendment.  Where, as here, retaliation against a perceived disfavored viewpoint is the motive, that ends the inquiry.  *See Perry v. Sindermann*, 408 U.S. 593, 597-98 (1972); *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, 2025 WL 573764, at *15 (D. Md. Feb. 21, 2025).

The January 22, 2025 email of the Acting Secretary and its implementation is retaliatory and worse yet, it is being applied to target employees who do not work in a DEIA office.   Even if the January 22, 2025 Email of the Acting Secretary did not have a retaliatory motive, it still would violate the First Amendment because it discriminates against Plaintiffs for its associative activities.  Where government regulation is viewpoint discriminatory, that "is 'all but dispositive' in a First Amendment challenge."  *Nat'l Ass'n of Diversity Officers*, 2025 WL 573764, at *15 (quoting *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 571 (2011)).   It is dispositive because "viewpoint discrimination is uniquely harmful to a free and democratic society."  *Nat'l Rifle Ass'n v. Vullo*, 602 U.S. 175, 187 (2024).  The Supreme Court held in *Vullo*, "the First Amendment prohibits government officials *from relying on 'the threat of invoking legal sanctions and other means of coercion* … to achieve the suppression' of disfavored speech."  *Id*. at 176 (emphasis added).

**C.    The January 22, 2025 Email of the Acting Secretary and its Implementation Violates the Due Process Clause of the Fifth Amendment.**

The Fifth Amendment provides that no person shall be deprived of "life, liberty or property without due process of law." In the context of federal employees, the Supreme Court held in *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985) that non-probationary public employees have a constitutionally protected property interest in continued employment and cannot be deprived of that interest without notice and an opportunity to respond before adverse action. Here, Plaintiffs were designated as DEIA employees working in a DEIA office, and were placed on administrative leave on January 22, 2025 and removed from agency systems, barred from applying to positions, denied access to details, transfers and reassignments, and issued RIF notices without any prior process. This is a clear violation of their due process rights under *Loudermill*.

**II.    A TRO IS NEEDED TO STOP IRREPARABLE HARM**

To enter a TRO, irreparable harm must be "'both certain and great,' 'actual ... not theoretical,' and 'of such imminence that there is a clear and present need for equitable relief.'" *Drs. for Am. v. Off. of Pers. Mgmt.*, 2025 WL 452707, at *8 (D.D.C. Feb. 11, 2025) (quoting *Wis. Gas Co. v. Fed. Energy Regul. Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985)). This is a "high standard," *id.*, but amply met in the context of the January 22, 2025 Email of the Acting Secretary and its implementation, which is imposing extraordinary and escalating injury on Plaintiffs. Constitutional rights already have been violated, Plaintiffs have been denied an opportunity to accept the deferred resignation offer and some hiring officials have withdrawn job offers and others have refused to engage with the Plaintiffs.

If no TRO is granted, the Plaintiffs will be targeted and will not be eligible for access to details, transfers and reassignments, or the deferred resignation offer or reemployment with the federal government.    If that happens, the fact that the January 22, 2025 Email of the Acting Secretary and its implementation by the Agency is unconstitutional will make no difference.

## A.    Plaintiffs are Suffering Irreparable Economic Harm

As a result of the January 22, 2025 Email of the Acting Secretary, Plaintiffs have been targeted and will suffer irreparable economic harm. While economic loss is not always irreparable, *Harris v. Bessent*, 2025 WL 521027, at *8 (D.D.C. Feb. 18, 2025) (granting TRO), economic injuries justify emergency equitable relief where "legal remedies after the fact [are] inadequate to restore the party seeking a stay to the status quo ante." *Mann v. Wash. Metro. Area Transit Auth.*, 185 F. Supp. 3d 189, 195 (D.D.C. 2016).  Where damages are unrecoverable (for example, due to sovereign immunity), "significant" economic loss may constitute irreparable harm.  *Luokung Tech. Corp. v. Dep't of Def.*, 538 F. Supp. 3d 174, 192 (D.D.C. 2021) (issuing injunction).

## B.    The January 22, 2025 Email of the Acting Secretary and its Implementation Have Impaired Plaintiffs' Constitutional Rights

"[T]here is a presumed availability of federal equitable relief against threatened invasions of constitutional interests."  *Davis v. District of Columbia*, 158 F.3d 1342, 1346 (D.C. Cir. 1998). "[A] prospective violation of a constitutional right constitutes irreparable injury for … purposes" of such relief.  *Karem v. Trump*, 960 F.3d 656, 667 (D.C. Cir. 2020) (quoting *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013)). Multiple such invasions and violations have already occurred, and many more are imminent.

First Amendment. "The loss of First Amendment freedoms, for even minimal periods of time, constitutes irreparable injury." *Cigar Ass'n of Am. v. U.S. FDA*, 317 F. Supp. 3d 555, 562 (D.D.C. 2018) (granting injunction) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Such a showing can be based on "First Amendment freedoms [that] are actually lost," or that "imminently will be." *Bailey v. Fed. Bureau of Prisons*, 2024 WL 3219207, at *9 (D.D.C. June 28, 2024) (granting injunction). The January 22, 2025 Email of the Acting Secretary and its implementation attacks Plaintiffs as advancing a policy agenda and sets out specific retaliatory consequences. In retaliating against Plaintiffs for their erroneously perceived First Amendment activity, the Email and its implementation threaten to halt the Plaintiffs perceived speech.

These First Amendment violations are "certain, because [they] ha[ve] already occurred, and [are] ongoing." *Simms v. District of Columbia*, 872 F. Supp. 2d 90, 105 (D.D.C. 2012); *see also Cigar Ass'n of Am.*, 317 F. Supp. 3d at 562 (a showing of irreparable harm is sufficient where an order "'threaten[s] or in fact ... impair[s]' … First Amendment interests 'at the time relief is sought.'" (second omission added) (quoting *Elrod*, 427 U.S. at 373)).

Fifth Amendment. "[A] violation of Fifth Amendment due process rights" also suffices for a finding of irreparable harm. *Karem*, 960 F.3d at 668; *see also Vote Forward v. DeJoy*, 490 F. Supp. 3d 110, 121, 129-30 (D.D.C. 2020) (enjoining threatened impairment of voting rights). The January 22nd Email and its implementation violate Plaintiffs' due process rights because it finds wrongdoing and imposes punishment without prior notice, an opportunity to be heard, a fair and impartial factfinder, or any other semblance of fair process. The Defendant interferes with Plaintiffs' professional liberty interests, their liberty interests in their reputations, and their protected property interests in their employment. The harm inflicted by the actions of the Defendant is ongoing, and "do[es] not … require proof of any injury other than the threatened

constitutional deprivation itself." *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) (quoting *Davis*, 158 F.3d at 1346).

For the reasons above, the Plaintiffs have already been harmed by these "violations of [its] rights to equal protection of the laws under the Fifth Amendment," which "are irreparable." *Doe 1 v. Trump*, 275 F. Supp. 3d 167, 216 (D.D.C. 2017), *vacated sub nom. Doe 2 v. Shanahan*, 755 F. App'x 19 (D.C. Cir. 2019) (vacated on other grounds). Relief is necessary to curb prevent harm.

## C.    Plaintiffs are Suffering Ongoing and Irreparable Reputational Harm.

"Because injury to reputation or goodwill is not easily measurable in monetary terms it is typically viewed as irreparable." *Xiaomi Corp. v. Dep't of Def.*, 2021 WL 950144, at *9 (D.D.C. Mar. 12, 2021) (cleaned up). The reputational injury here is no exception. Not only does the January 22, 2025 Email and its implementation disparage the Plaintiffs, it threatens severe restrictions on the Plaintiff's access to benefits offered to all federal employees, including the deferred resignation offer and continued employment. *See League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) (reversing denial of injunction; "obstacles" that "unquestionably make it more difficult for [movant] to accomplish [its] primary mission" establish irreparable harm); *Nat'l Council of Nonprofits v. OMB*, 2025 WL 368852, at *12 (D.D.C. Feb. 3, 2025) (same) (issuing TRO).

Emergency relief that preserves Plaintiffs' ability to not be labeled and targeted as DEIA employees is necessary to limit the reputational damage.

## III.    THE EQUITIES AND PUBLIC INTEREST STRONGLY FAVOR A TRO

Where a movant "seeks to enjoin the government, the final two TRO factors—balancing the equities and the public interest—merge." *Am. Foreign Serv. Ass'n v. Trump*, 2025 WL 435415, at *1 (D.D.C. Feb. 7, 2025) (citation omitted).  Courts weigh "the competing claims of injury and … consider the effect on each party [and the public] of the granting or withholding of the requested relief." *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citation omitted).

Here, the balance of the equities and the public interest overwhelmingly favor a TRO.  The injury to Plaintiffs has been immediate and severe.  The Plaintiffs have suffered immense reputational harm by being falsely branded as working in programs that are "illegal and immoral" and "dangerous" and causing "disastrous consequences." In contrast, any purported injury to the United States is non-existent.

There is no public interest in an executive branch agency implementing a policy contained in the January 22, 2025 Email and its implementation by the Agency, like the present one.  *See League of Women Voters*, 838 F.3d at 12 ("There is generally no public interest in the perpetuation of unlawful agency action.").  But there is a "substantial public interest" in having governmental agencies "abide" by the law.  *Id.* (citation omitted).

Unless enjoined, the January 22, 2025 Email of the Acting Secretary and its implementation will undermine the strong public interest in federal employees performing assigned work without fear of government retribution.

## <u>CONCLUSION</u>

Plaintiffs respectfully requests that the Court hold a hearing as soon as possible, grant the motion for a temporary restraining order, and enter the attached proposed order.

Date: April 18, 2025                              Respectfully submitted,


                                                 */s/ David A. Branch*
                                                 David A. Branch
                                                 D.C. Bar No. 438764
                                                 Law Office of David A. Branch & Assoc.,
                                                 PLLC
                                                 1120 Connecticut Avenue, NW #500
                                                 Washington, DC 20036
                                                 202.785.2805
                                                 davidbranch@dbranchlaw.com